IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 04-cv-00200-WDM-BNB

ESTATE OF GREGORY LEE SMITH JR.
by and through Regina Keith, Personal Representative,

      Plaintiff,

v.

ROBERT SILVAS,
JIM TURNEY, in their individual capacities;
JOHN DOE SUPERVISORY DENVER POLICE OFFICERS I-V;
GERALD WHITMAN, Chief of Police of the City and County of Denver; and
THE CITY AND COUNTY OF DENVER,

      Defendants.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

Miller, J.

      This matter is before me on the motion for summary judgment filed by

defendants Gerald Whitman and the City and County of Denver on January 21, 2005.  I

have reviewed the parties' written arguments and their summary judgment evidence

and find that oral argument is not required.  For the reasons that follow, the motion will

be granted.

### Background[1]

      Plaintiff's claims against defendants Gerald Whitman (Whitman) and the City

---

[1] Unless otherwise noted, the background  facts, drawn from the parties' factual
statements and supporting evidence, appear to be undisputed.

and County of Denver (the City) stem from a family dispute that culminated in the shooting and killing of eighteen-year-old Gregory Lee Smith (Smith).  On the evening of January 29, 2002, Regina Keith, Smith's mother, called 911 after a family dispute led Smith to throw a brick through the window of her car.  When Denver police officers arrived, they found that Smith was gone, so they obtained a report from Ms. Keith and instructed her to call them if he returned.  Just after midnight on January 30, 2002, Ms. Keith again called 911, indicated that Smith had returned, and asked for police assistance.

The first police officer to arrive at the scene was Jim Turney, who was directed by Ms. Keith to the back of the house where Smith's room was located.  Ms. Keith opened the back door for Officer Turney and pointed out Smith's bedroom at the bottom of a stairwell.  At this point, Smith was in his room with the door open, but he quickly shut the door when Officer Turney tried to speak with him.  Shortly thereafter, Officer Silvas arrived and joined Officer Turney at the top of the stairwell.  Next, Smith's sister, Joanne, called down to her brother to open the door.  From this point the parties' accounts differ significantly.  Defendants claim that Smith abruptly opened the door, began climbing the stairs, stopped, bent over and pulled out a three-inch utility knife. The officers shouted at him to drop the knife, but he continued up the stairs toward the officers, and they fatally shot him when he was within three to five feet.  In contrast, Plaintiff claims that Smith never went further than putting one foot on the first step, and although he did pull out a knife, he never threatened anybody with it and was never an imminent threat to the officers or his family.

2

As a result of the shooting, Smith's Estate (the Estate) brought this action asserting various clams against Officers Turney & Silvas, four unknown supervisory officers, Whitman, and the City.  The pending motion seeks dismissal of the following claims: (1) failure to train and/or supervise claims against the City, four unknown officers, and Whitman, pursuant to 42 U.S.C. § 1983; (2) Due Process claims against Whitman and the City, pursuant to section 1983 and the Fifth and Fourteenth Amendments; and (3) Americans with Disabilities Act claims against the City, pursuant to 42 U.S.C. § 12132.[2]

<u>Standard of Review</u>

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'"  *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).  Then, "[t]o avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the

---

[2] Because the Estate's brief indicates that it is not pursuing either its ADA claims, or its claims against the four unknown officers, these claims will be dismissed.

presence of each element essential to the case." *Id.*

Discussion

1.    Municipal Liability

The Estate asserts various theories of municipal liability under section 1983: (1) the City failed to properly train its police officers on how to react when confronted by a citizen with a knife; (2) the City failed to properly supervise and discipline Officer Silvas throughout his career; (3) the City's delay in deploying less deadly weapons demonstrates deliberate indifference to the safety of its citizens; and (4) the City's conduct is so outrageous that it deprived Smith of his due process rights.

a.    Failure to Train

In *Monell v. New York City Dep't of Social Servs.*, 98 S.Ct. 2018 (1978), the Supreme Court held that a municipality cannot be held liable under section 1983 for the actions of its employees under the theory of *respondeat superior*. *Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000).  However, when a municipality's failure to train its police officers demonstrates a deliberate indifference to the rights of citizens, then the city itself may be held to have caused the injury and should be liable. *City of Canton v. Harris*, 489 U.S. 378, 388, 390 (1989).  In order to establish a failure to train case, the plaintiff must show that: (1) police action violated the plaintiff's constitutional rights; (2) the injury arose under circumstances "which constitute a usual and recurring situation with which police officers must deal;" (3) "there is a direct causal link between the alleged constitutional deprivation and the inadequate training;" and (4) the city's

4

failure to train demonstrates deliberate indifference to the constitutional rights of citizens. *Zuchel v. City and County of Denver*, 997 F.2d 730, 734-35 (10th Cir. 1993).

In this case, for summary judgment purposes, Whitman and the City concede the first two *Zuchel* elements. I therefore will assume that the shooting constituted excessive force and that Denver police officers regularly must confront knife wielding suspects, and will focus my analysis on the Estate's deliberate indifference and direct causation showings.

Deliberate indifference means more than simple or even heightened negligence. *Bd. of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997). It requires "an act or omission purposefully committed by a person who must have realized that the conduct was unnecessarily dangerous or which conduct was done heedlessly or recklessly, without regard to the consequences, or without regard to the rights and safety of others." *Zuchel*, 997 F.2d at 735.

In addition to meeting the strict deliberate indifference standard, the plaintiff must also make a strong causation showing. There must be a direct causal link between the municipal action and the specific constitutional deprivation, such that the municipality, through its deliberate conduct, is the moving force behind the injury alleged. *Brown*, 520 U.S. at 404.

Clearly these burdens are very difficult to meet, but this is intentionally so, lest the law devolve into *"de facto respondeat superior* liability." *City of Canton*, 489 U.S. at 392. *See also Brown*, 520 U.S. at 405 (emphasizing the need for "rigorous standards

5

of culpability and causation . . . to ensure that the municipality is not held liable solely for the actions of its employee").

The Estate admits that the Denver Police Department specifically trains its officers on confrontations with suspects who are armed with knives.  (Pl's Resp. at 31.) It also admits that officers are trained to use the minimum amount of force necessary to gain compliance of a subject and not to shoot unless they believe that the suspect represents an imminent threat of serious physical harm to an officer or another citizen. *Id.* at 24-25.  In addition, and as summarized below, Officer Silvas was disciplined and required to undergo special firearms training after certain events.

Despite these undisputed facts, the Estate lists a multitude of ways that it claims police training could be improved.  It completely fails, however, to come forth with evidence that the City knew about the alleged deficiencies, or that the need for improvement was so obvious as to imply deliberate indifference.  In these circumstances, summary judgment is appropriate.  *See City of Canton*, 489 U.S. at 391 (explaining that it is not enough "to prove that an injury or accident could have been avoided if an officer had had better or more training"); *Carr ex rel. Estate of Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003) (affirming summary judgment because plaintiff's "scattershot recital of alleged inadequacies . . . fails to provide evidence of how the City had notice that its actions (or failures to act) were likely to result in constitutional violations").

      b.    <u>Failure to Supervise</u>

In addition to their failure to train claim, the Estate also asserts that the city is liable for failure to properly supervise Officer Silvas throughout his career.[3]  This claim requires essentially the same showing of deliberate indifference and direct causation as discussed above.  *Sutton ex rel. Sutton v. Utah State Sch. for the Deaf and Blind*, 173 F. 3d 1226, 1240 (10th Cir. 1999); *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993).

In support of its claim, the Estate argues that Officer Silvas has engaged in numerous acts of misconduct throughout his long career.[4]  However, the issue always remains whether, viewing the evidence in the light most favorable to the Estate, does it give rise to a reasonable inference that the City was deliberately indifferent to the risk that Silvas would improperly shoot the decedent in the circumstances.  *See Brown*, 520 U.S. at 412 (noting that "the connection between the background of the particular applicant and the <u>specific</u> constitutional violation alleged must be strong") (emphasis added).  Specifically, the issue is whether the City had notice that its actions or inactions will likely result in the constitutional violation, namely an unconstitutional or improper shooting, not simply a shooting.  *Id.; Carr*, 337 F.3d at 1229.

---

[3] No evidence is submitted to suggest Officer Turney's record provided notice or other cause to believe action or inaction would likely result in a constitutional violation.

[4] At the time of the shooting Officer Silvas had been with the Denver police for about 27 years.

7

Officer Silvas has an extensive history of incidents involving guns.  Plaintiff provides a litany of various events which bear repeating to the extent they are acknowledged by defendants or are supported by appropriate Rule 56(c) evidence:[5]

•In May 1979, Silvas shot and killed a 16-year old youth who had allegedly pulled a gun on Silvas.

•In May 1980, Silvas shot and wounded an individual named Caranza.

•In May 1982, Silvas shot and wounded a bystander who allegedly pointed a gun at him.

•In January 1983, when working as an undercover officer, Silvas shot and killed an 18-year old who had been ordered to freeze but moved his hand and began to stand up.

•In September 1984, Silvas was involved in a violent domestic argument with his wife, also a police officer.  Silvas pushed a cocked revolver into his wife's face and threatened to kill her in front of another police officer.

•In April 1986, Silvas shot and wounded an individual who had pointed a gun at him.

•In May 1988, Silvas shot and killed an individual who allegedly pointed a rifle at officers at a crime scene.

•In January 1991, Silvas and other officers engaged in a shoot-out in which two robbery suspects were shot and killed.

---

[5]Allegations of the Estate supported solely by newspaper reports are hearsay and were not considered as proper summary judgment evidence.  *See* Fed. R. Civ. P. 56(e); *Int'l Bus. Machs*, 48 F.3d 478, 485 (10th Cir. 1995).

•In March 1997, Silvas was involved with other officers in the pursuit of a van which involved several rounds of ammunition being fired at the van.

In addition Officer Silvas has been accused several times of unnecessary use of physical force as recently as 1998 at a Bronco football game, 1999 while breaking up a party at a home, and 1999 while making a traffic stop.

Remarkably, in his deposition Officer Silvas stated that he does not recall virtually any of these instances, including the dramatic confrontation with his wife witnessed by another officer.

In response, the defendant points out that Silvas was disciplined several times, including suspensions without pay and that he was required to undergo additional firearm training after the last shooting involving the 1997 van chase, approximately five years before Mr. Smith was shot.

The evidence also demonstrates that on two occasions Silvas received official commendations for not shooting individuals who threatened him and other officers with 12-inch butcher knives (January 1987 and November 1998).

With particular regard to the incidents involving shootings, the defense emphasizes that the Estate does not make any claim that the Silvas's decision to shoot in any case was unwarranted and there is no admissible evidence that any constituted an improper or unconstitutional use of deadly force.

This factual background in a summary judgment context presents a difficult issue:

Can a reasonable jury infer that the City was deliberately indifferent to the risk that Officer Silvas would use constitutionally excessive force by improperly shooting Mr. Smith?  On the one hand it is undisputed that the City has institutional knowledge of Silvas's history of at least eight shootings, resulting in five deaths, in four separate events, as well as a record of threats and abuse.  On the other hand, it is also undisputed that: (1) no shooting was ever found to be improper; (2) Silvas was disciplined; (3) he was required to take additional training concerning the use of firearms; (4) he had a history of commendable restraint in the face of two serious threats; and (5) several years had passed since his last discharge of a firearm.

The bar for such supervisory liability is quite high.  In *City of Canton, Ohio v. Harris*, Justice White noted that a showing concerning the need for more or different training must be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the City can reasonably be said to have been deliberately indifferent to the need."  489 U.S. 378, 390 (1989).  The same standard would be applicable as to the need for more or different supervisory action in this case.

The Tenth Circuit has restated the deliberate indifference standard of *City of Canton* to require a showing that "the municipality has actual or constructive notice that its action or failure to act is <u>substantially certain</u> to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."  *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (emphasis added).  The issue can thus be restated: did the City of Denver have notice that its failure to further supervise was

10

substantially certain to result in an unconstitutional shooting and choose to consciously or deliberately disregard that risk?

Certainly a reasonable jury could conclude from Officer Silvas's history of shooting (and killing) individuals in the course of his police service that the City had notice that he may use deadly force.  Beyond that, however, can a reasonable juror infer that the City had notice that Silvas's use of force would be so excessive as to be unconstitutional?  There is no evidence that he ever improperly fired his weapon. Further, considering the discipline imposed, additional training required, and the significant temporal separation from the last shooting involving Officer Silvas, evidence is lacking to show a "direct causal link" between the shooting and inadequate supervision.  I find that, considering the evidence as a whole and drawing all reasonable inferences in favor of the Estate, the City did not have notice that it was substantially certain that a constitutional violation would occur.

      c.    <u>Failure to Use Less-Deadly Weapons</u>

The Estate also alleges that the City's failure to sufficiently deploy less-lethal weapons indicates deliberate indifference.  The Estate does not dispute the fact in February 2000, the City established a working group to consider the use of less-deadly weapons, and in 2002 decided to deploy tasers, bean-bag shotguns, pepper-ball systems, and other less-deadly weapons to their officers.  The Estate nonetheless argues that the City should have done more, and was too slow to deploy tasers in particular.  This argument, however, fails for substantially the same reasons that the

11

Estate's failure to train arguments do.  It is not enough for the Estate to simply point to something that the City could have done.  *City of Canton*, 489 U.S. at 391.

>    d.    Due Process Claim

The Estate's final claim against the City alleges a violation of Smith's Due Process rights under the Fifth and Fourteenth Amendments.  Such claims in section 1983 cases are governed by the familiar "shock the conscience" standard.  *Sutton*, 173 F. 3d at 1240.  Accordingly, the Estate must do more than show that a "government actor intentionally or recklessly caused injury . . . by abusing or misusing government power, they must demonstrate "a degree of outrageousness . . . that is truly conscience shocking."  *Uhlrig ex rel. Uhlrig v. Harder*, 64 F.3d 567, 571 (10th Cir. 1995).

The Estate cites no new evidence in support of this claim, but instead re-characterizes its other claims as a Due Process claim.  Thus, their argument is essentially that the City's failure to properly train and supervise its officers, and its failure to sufficiently deploy less-deadly weapons shocks the conscience.  I disagree.  Considering the evidence as a whole, I conclude that no reasonable jury could find that the City's conduct rises to the level of a Due Process violation, and therefore summary judgment is appropriate as to this claim.

2.    Whitman Liability

In addition to its claims against the City, the Estate brings a failure to train/supervise claim against Chief Whitman, pursuant to section 1983.  To succeed in such a section 1983 supervisory liability claim, the Estate must again demonstrate deliberate indifference, as well as "an affirmative link" between the supervisor's conduct

12

and the constitutional deprivation." *Holland v. Harrington*, 268 F.3d 1179, 1187 (10th Cir. 2001); *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir. 1992).

The Estate does not claim that Chief Whitman was present at the scene of Smith's shooting, or that he directly participated in the incident.  And, in their brief, the Estate makes little attempt to argue Whitman's liability separately from that of the City's.  In general, Whitman's actions are merely lumped together with the City's.  There is no evidence that links Whitman to any action by the officers before the incident.  Ultimately, the Estate fails to provide me with any evidence or legal theory that would indicate that Whitman could be liable, given that I have already found their claims against the city lacking.  Accordingly, for essentially the same reasons given above, summary judgment is appropriate as to this claim as well.

Finally, the Estate also lumps Chief Whitman into their Due Process Claims.  As with their evidence against the City, the Estate's evidence against Whitman is inadequate to support a finding of behavior that shocks the conscience.  Therefore, Chief Whitman is entitled to summary judgment.

Accordingly, it is ordered:

1.    Defendants Gerald Whitman and the City and County of Denver's motion for summary judgment, filed January 21, 2005 (Docket No. 27), is granted.

2.    All of Plaintiff's claims against defendants Gerald Whitman and the City and County of Denver are dismissed with prejudice.

3.    Plaintiff's claims against unknown officers are dismissed.

13

4.      Defendants Robert Silvas and Jim Turney's motion to bifurcate trial (Docket No.

58) is denied as moot.

5.      The case remains pending for trial on Plaintiff's claims against defendants

Robert Silvas and Jim Turney.

DATED at Denver, Colorado, on January 27, 2006.

BY THE COURT:


s/ Walker D. Miller
United States District Judge